**WO**

NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| First Charter Financial Corporation,<br><br>        Plaintiff,<br><br>v.<br><br>Pandey Hotel Corporation,<br><br>        Defendant. | No. CV-15-02361-PHX-DJH<br><br>**ORDER** |

       First Charter Financial ("FCF") and Victor Weintraub ("Weintraub") (collectively, "Plaintiffs")[1] allege that, pursuant to the terms of two contractual agreements ("the Agreements") with Pandey Hotel Corporation ("Pandey" or "Defendant"), Pandey agreed to pay FCF a commission fee of 1% of the amount of any financing obtained with Plaintiffs' assistance. (Doc. 1-2 at 6). Plaintiffs allege that Pandey withheld payments to Plaintiffs. (Doc. 1). Pandey acknowledges its failure to pay, but argues that its actions were justified. (Doc. 116). Based on these allegations, Plaintiffs filed nine claims for relief in their First Amended Complaint ("FAC") including: breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, negligence, negligent misrepresentation, declaratory relief, and injunctive relief.[2] (Doc. 30 at 7-14).

---

[1] Although Weintraub is technically a third-party Defendant, this order will refer to Weintraub and FCF collectively as "Plaintiffs."

[2] Claims alleged against Defendant First American Title Insurance Company ("FATCO") were dismissed on October 24, 2016. (Doc. 47).

Pandey filed Counterclaims against FCF and a Third-Party Complaint against Weintraub. (Doc. 84). Pandey alleges that, pursuant to the Agreements, Plaintiffs were party to Pandey's confidential and proprietary business information. (Doc. 84 at 11). Allegedly, Weintraub disclosed improper communications that included proprietary business information, information to lenders on how to negotiate against Pandey's interests, disparaging remarks about Pandey, and interference with Pandey's attempts to obtain alternative lending arrangements. (*Id*. at 12-13). Pandey alleges that the communications were made by Weintraub while the Agreements were in effect and that his conduct was intentional, malicious, and outrageous, causing Pandey to suffer reputational and economic harm.

Plaintiffs sought judgment on the pleadings on three of Pandey's counterclaims (Doc. 107). The Court found that fact issues precluded judgment on Pandey's Count One claim of breach of fiduciary duty. (Doc. 145). The Court found in Plaintiffs' favor and ordered Pandey's Count Two, alleging breach of statutory duty, dismissed. (*Id*.). As for Pandey's Count Three, tortious interference claim, the Court found that a claim for relief for tortious interference with Pandey's relationship with lender Thorofare plausible. Pandey moved for partial summary judgment on whether an agency relationship between it and Plaintiffs existed, arguing that if it did, then all of Plaintiffs' claims should be dismissed. (Doc. 116). The Court found that an agency relationship existed but found an issue of fact on when that relationship began and ended. (Doc. 145 at 11-18).

The parties proceeded to a bench trial on their remaining claims on March 26 and 27, 2019. Three witnesses testified, Plaintiff, Victor Weintraub; John Anderson, Pandey's Chief Executive Officer; and John Searby, Pandey's Chief Finance Officer. Thereafter, the parties submitted their Proposed Findings of Fact and Conclusions of Law on April 1, 2019 (Docs. 199 and 200). The Court now issues its findings and conclusions.

# I.   FINDINGS OF FACT[3]

1.      FCF is an Arizona licensed commercial mortgage banker. (Doc. 174 at 3-4).

---

[3] The Findings of Fact include the evidence and testimony presented at trial, and the parties' fact stipulations throughout the course of this case.

2.      Weintraub is the sole shareholder of FCF and serves as its officer and director.  (*Id.*).

3.      Pandey is a Delaware corporation that acquires, owns, and operates hotels in the United States and requires mortgage financing in connection with its business operations.  (*Id.*).

4.      John Andrews ("Andrews") is Pandey's Chief Executive Officer.  (*Id.*).

5.      John Searby ("Searby") is Pandey's Chief Financial Officer.  (*Id.*).

6.      Societe General ("So-Gen") is a financial lender and Bill Lewiki is Vice President of So-Gen.  (Unofficial Court Transcript ("UT") from Mar. 27, 2019 (hereinafter "UT 3/27/19") at 29, and Tr. Exh. 112).

7.      Thorofare Capital is a financial lender.  Bill Lanting is/was an Originator (Exh. 44) and Brendan Miller is/was Chief Investment Officer of Thorofare.  (Tr. Exh. 53).

8.      Andrews and Weintraub met at a conference in October 2014.  (UT 3/26/19; and Tr. Exh. 126).

9.      Thereafter, Weintraub and Anderson discussed engaging FCF to seek mortgage financing for Pandey. (UT 3/26/19 at 19; Doc. 145 at 2).

10.     FCF/Weintraub and Pandey first discussed the possibility of FCF brokering mortgage financing for Pandey in December 2014.  (Doc 174 at 4; Tr. Exh. 136).

11.     Plaintiffs sought and received Pandey's 2012 – 2013 financial statements, its financial and property records including 12-month property trailing statements, prior tax returns, a list of its properties, its parent company financial and operating information, and information on several hotel properties it owned or were evaluating to acquire.   (UT 3/26/19 at 20, 31, 33; UT 3/27/19 at 31, 83-84; and Tr. Exhs. 11, 12, 126 & 136).

12.     During 2014 and 2015, Plaintiffs and Defendant discussed mortgage financing for various hotel properties including: Valley River Inn, Eugene, Oregon; Holiday Inn, Lafayette, Indiana; Sheraton Four-Points, Lafayette, Indiana; Baymont Inn, Las Vegas, Nevada; Dolce-Atlanta Peachtree, Peachtree, Georgia; and Radisson, Aurora, Colorado.  (Tr. Exh. 13, 36, 37 and 38).

13. Pandey sought to acquire two properties, the Holiday Inn, Lafayette and the Sheraton Four-Points, Lafayette, owned by a single owner who required the properties be purchased together. (UT 3/27/19 at 79, 147).

14. Pandey required $21 million in loans to acquire the two Lafayette properties and decided to use its Baymont Inn Las Vegas property as collateral because it was without a mortgage. (*Id*.).

15. Plaintiffs were informed by Pandey of the necessity to secure a $21 million loan to acquire the Holiday Inn and Sheraton Four-Points. (*Id*. at 13, 79, 148, and Tr. Exh. 36).

16. Plaintiffs assured Pandey that it could acquire the $21 million required. (*Id*.).

17. Plaintiffs and Pandey entered into two contracts, the Holiday Inn Lafayette/So-Gen Agreement (Tr. Exh. 3), and the Sheraton Four-Points Lafayette/Thorofare Agreement (Tr. Exh. 17) (collectively, "the Agreements").

18. The Agreements provide that Pandey hired Plaintiff as a "Mortgage Broker and financial consultant to assist [Pandey] in obtaining new financing" to acquire each hotel property. (*Id*.). The Agreements state that "[Pandey] agrees to pay [FCF] a fee of 1.00% of the face or stated amount of any financing placed by, through or with the assistance of FCF." (*Id*.).

19. The Agreements "can be canceled by either party on 30 days written notice" and do not preclude Pandey from seeking financing from or through other sources. (UT at 3/27/19 at 74; Tr. Exhs. 13 and 17).

20. The April 9, 2015 Holiday Inn/So-Gen Agreement conveyed a loan offer of $12 million for the Holiday Inn property. (Tr. Exh. 3).

21. The April 17, 2015 Sheraton Four-Points/Thorofare Agreement conveyed a loan offer of $9 million collateralized by the Sheraton Four-Points and Baymont Inn, Las Vegas. (Tr. Exhs. 17 and 22).

22. John Andrews signed the Agreements on behalf of Pandey in May of 2015 and sent the Agreements to Weintraub on May 28, 2015. (Tr. Exh. 48).

23. Plaintiffs secured a $12 million loan from So-Gen and the loan closed on or about October 2, 2015. (*Id.*).

24. Plaintiffs entered into "sub-servicing" agreements with So-Gen to work for and provide services to So-Gen and its successors in exchange for certain fees in connection with So-Gen's loan to Pandey. (UT 3/27/19 at 42-44; Tr. Exh. 112 and 113). The sub-servicing fees were to be paid by Pandey, through the lender, to Plaintiffs. Plaintiffs did not disclose its sub-servicing fee arrangement to Pandey. (UT 3/27/19 at 139 and 150).

25. As part of Thorofare's $9 million loan offer, Andrews negotiated and received a $1 million loan advance to fund expenses and deposits associated with the Lafayette property transactions. (UT 3/26/19 at 56; Tr. Exh. 42).

26. Weintraub did not negotiate the $1 million loan with Thorofare; however, he did receive a $10,000 commission because he was "broker of record" and provided third-party reports. (*Id.*; Tr. Exhs. 39 and 138).

27. On May 28, 2015 Weintraub, while acting as Pandey's broker, e-mailed Lanting/Thorofare about Pandey stating, among other things, "with these kinds of properties you were dealing with the real estate equivalent of the junk bond market." He also stated, "Bill, these guys are weird." (UT 3/27/19 at 8; Tr. Exh. 40).

28. On June 3, 2015, Lanting informed Weintraub that Thorofare approved the $1 million loan. (Tr. Exh. 110). Shortly thereafter, Lanting left Thorofare. (Tr. Exh. 51).

29. On June 22, 2015, Brendan Miller of Thorofare exchanged emails with Weintraub stating concerns about the value of the Sheraton Four-Points property and stated that the loan offer may be reduced. (Exh. 23 at 52-54). Weintraub's response reminded Miller that, as part of Thorofare's $9 million loan offer, Pandey was required to pay all fees for the $9 million when it acquired the $1 million advance. (Tr. Exh. 23).

30. Thorofare reduced the $9 million loan offer stating concerns over the property appraisals. (Tr. Exh. 54).

31. Pandey was required to pay Thorofare fees associated with the $1 million

advance although the $9 million loan was rescinded, costing Pandey an estimated $85,000. (UT 3/27/19 at 160; Tr. Exh. 22).

32.     When the Thorofare loan fell through, Pandey immediately sought out other lenders to complete the acquisition of the Lafayette properties because the seller would not extend the closing deadline.  (UT 3/27/19 at 91-92).

33.     Plaintiffs obtained a loan proposal from Columbia Pacific Advisors for $6 million, which was later reduced to $4.6 million for the Sheraton Four-Points Property. (*Id.* at 17-19; Tr. Exh. 26 and 27).  The reduced amount was insufficient for Pandey's needs.  (*Id.*).  Pandey later obtained a loan for the Four-Points property for $6 million from the Levine Group.  (*Id.* at 21).

34.     Plaintiffs submitted to Pandey an invoice for the CPA loan (Tr. Exh. 32) and the Levine Loan (Tr. Exh. 33).

35.     Plaintiffs cancelled its Sheraton Four-Points commission Agreement with Pandey via email on September 28, 2015, triggering the 30-day notice.  (Tr. Exh. 17).

36.     Plaintiffs submitted invoices to Pandey for commission fees totaling $120,000 for the So-Gen loan (Tr. Exh. 4), and $60,000 for the Levine Group loan (Tr. Exh. 33).

37.     Searby instructed Pandey to hold off on paying Plaintiffs in order to first reconcile Plaintiffs' billing invoices with work performed.  (UT 3/27/19 at 144; Tr. Exhs. 8 and 10).

38.     Pandey declined to pay Plaintiffs the $120,000 commission for the So-Gen loan, and requested Plaintiffs remit a $24,500 wire deposit it claims was sent to Plaintiffs in error.  (Tr. Exh. 138).  The wire deposit was sent to Plaintiffs on October 2. 2015.  (*Id.*).

39.     Plaintiffs refused to remit the $24,500, stating that amount was a commission for obtaining the financing for the Baymont Inn and Suites.  (*Id.*).

40.     The disputed $120,000 commission for the Holiday Inn loan is held by the Court pending case resolution.  (Docs.  47 & 52).  An additional $23,000 is held by the Court for the "Sheraton Holdback" from the Sheraton-Four Points property.  (*Id.*; Tr.

Exh. 9). The parties did not discuss the Sheraton Holdback amount at trial.

## II. CONCLUSIONS OF LAW

### A. Post-Trial Motions

The Court must first address Defendant's Rule 52 motions because they directly affect the parties claims. At the close of Plaintiffs' case, Defendant moved pursuant to Fed.R.Civ.P. 52(c) that the Court find the agency relationship started on February 6, 2015 and ran through October 2, 2015. Plaintiffs disagree, arguing that there was no contractual duty or agency relationship until the engagement letters were signed and returned by Defendant in May 2015. The Court found that, based on the evidence and testimony so far, FCF and Weintraub were acting as Pandey's agent as of February 6, 2015. (UT 3/27/19 at 55). However, the Court permitted the parties to submit post-trial briefing on this issue.

Rule 52(c) provides in part that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense [. . . ] The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)."

### 1. Timing of the Agency Relationship

The Court previously found that an agency relationship existed between Plaintiffs and Pandey. (Doc. 145 at 17).[4] The only fact issue left for trial was when the agency relationship between Plaintiffs and Defendant began and ended.

Plaintiffs argue that, because the Agreements were not signed by Andrews until May 28, 2015, the Court cannot find that an agency relationship existed before that date. The Court disagrees. The testimony and evidence show that Plaintiffs began acting as Pandey's commercial mortgage broker in January 2015, when he sought and received Pandey's financial and property information and used that information to develop presentation materials and to make lender presentations on Pandey's behalf. Weintraub prepared and delivered the first engagement letter dated January 29, 2015. (Tr. Exh. 104). The letter

---

[4] Plaintiffs' alleged as much in Count Five of their FAC. (Doc. 30 at 11).

was accompanied by Plaintiffs' lender presentation that incorporated Pandey's property and financial information. (UT 3/27/19 at 5). Though there is evidence that Plaintiffs were acting as Pandey's agent in January, the first written confirmation of this relationship occurred on February 6, 2015. (Tr. Exh. 36). Therein, Weintraub explains to Andrews the lender contacts that have been made by Plaintiffs on its behalf on the Valley River Inn, Holiday Inn, Four Points and Quail Hollow properties. (*Id*.). Thus, Plaintiffs' agency relationship with Pandey began no later than February 6, 2015.

Weintraub testified that Pandey was still his client as of June 22, 2015. (UT 3/27/19 at 17). Thereafter, Plaintiffs continued to hold themselves out as working on behalf of Pandey as evidenced by email communications to prospective lenders, and Pandey personnel. (*See* Tr. Exhs. 114, 115, 117). The record further reflects that, after the Thorofare loan fell through, Plaintiffs continued to solicit other lenders for Pandey. (UT 3/27/19 at 16-17). Ultimately, the loans closed on October 1 and 2, 2015. Thus, Pandey argues that this would be the end date of the agency relationship and the Court agrees. (UT at 52). Therefore, the Court finds that the agency relationship began no later than February 6, 2015 and ended on October 2, 2015.

### 2. Commission on the Levine Group Loan – Sheraton Four Points

At close of trial, Defendant also moved pursuant to Rule 52 that Plaintiffs were not entitled to a commission or other compensation on the Levine Group Loan. Plaintiffs did not object. Plaintiffs sent Pandey an invoice for a $60,000 commission on a $6,000,000 loan from the Levine Group for the Sheraton Four-Points Hotel. (Tr. Exh. 33). The Court held that the evidence and testimony supported a preponderance of the evidence finding that Plaintiffs were not entitled to such commission or other compensation because the Levine loan was not placed by or through Plaintiffs.

In Count Two, Plaintiffs allege that it obtained a $4.6 million loan from Columbia Pacific Advisors ("C-PAC") and pursuant to the Sheraton/Baymont agreement, Pandey agreed to pay Plaintiffs a 1% commission. (FAC at 6). Plaintiffs allege that on the eve of closing that loan, Pandey refused to close and instead, used another lender. (*Id*.). In Count

Three, Plaintiffs allege that Pandey's "failure and refusal to pay [Plaintiffs] for the fee earned in connection with the financing of the Sheraton by C-PAC and/or its failure and refusal to pay [FCF] for the fee earned in connection with the financing" was a breach of the implied contractual duty of good faith and fair dealing. Plaintiffs have also alleged a claim of unjust enrichment (Count Four) and a claim of breach of principal's duty of good faith to its agent (Count Five) as it relates to the C-PAC loan offer.

At trial, Weintraub testified that C-PAC issued a term sheet proposing a $6 million loan for the Sheraton Four-Points on August 25, 2015. (Tr. Exh. 26). However, on September 3, 2015, C-PAC reduced the loan offer to $4.6 million. (Tr. Exh. 27). Andrews testified that Weintraub was told that Pandey required a $6 million loan for the Sheraton property and therefore it could not accept the reduced C-PAC offer. (UT 3/27/19 at 90). Thus, because the Sheraton property owner had a set closing deadline, Andrews contacted his brother-in-law to aid Pandey in securing an immediate loan from the Levine Group. (*Id*. at 91-92). Indeed, Weintraub reluctantly testified that he did not source the Levine Group loan. (*Id*. at 21-23). Plaintiffs' counsel also conceded the facts on which the Court relied.

Accordingly, Plaintiffs are not entitled to the $60,000 commission or any damages relating to the Sheraton Four-Points loan. Moreover, in Count Six, Plaintiffs sought a $23,000 fee from FATCO for loan proceeds from the Sheraton Four-Points loan, called the "Sheraton Holdback" amount. (Doc. 30 at 11-12). These funds were held by FATCO and were later submitted to the Court with the $120,000 commission from the So-Gen Loan, for a total of $143,000. Although the parties did not present testimony about the $23,000 holdback, there are exhibits in evidence that demonstrate that the $23,000 was held back from being paid to Plaintiffs because there was a dispute over whether Plaintiffs were entitled to those funds. The Sheraton Holdback was submitted to the Court pending the outcome of this litigation. Moreover, FATCO is no longer a party to this lawsuit. As FATCO is no longer a Defendant in this matter, Plaintiffs cannot seek damages against FATCO. Further, Plaintiffs have not established that they are entitled to the $23,000

commission.

Therefore, judgment is entered against Plaintiffs and for Defendants on Count Two of Plaintiffs' FAC. The Court also enters judgment for Defendants on Plaintiffs' Counts Three, Four and Five as it relates to the C-PAC offer and the Levine Group loan. Plaintiffs cannot collect damages against FATCO on Count Six, as FATCO is no longer a party to the lawsuit.

### B. Plaintiffs' Breach of Contract (Count One), Breach of Implied Contractual Duty of Good Faith and Fair Dealing (Count Three), Unjust Enrichment (Count Four), and Breach of Principal's Duty of Good Faith to Agent (Count Five) claims[5]

#### 1. Legal Standards

To succeed on a breach of contract claim, a party must prove the existence of a contract between the parties, a breach of contract terms, and resulting damages. *See Coleman v. Watts*, 87 F.Supp.2d 944, 955 (D. Ariz. 1998) (*citing Clark v. Compania Ganadera de Cananea, S.A.*, 95 Ariz. 90, 387 P.2d 235, 237 (1963). The duty of good faith and fair dealing is implied in every contract. *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986). "The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Id.* "The duty arises by operation of law but exists by virtue of a contractual relationship." *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 28 (Ariz. 2002) (citing *Rawlings*, 726 P.2d at 569–70). "A party may breach the implied covenant even in the absence of a breach of an express provision of the contract by denying the other party the reasonably expected benefits of the agreement." *Nolan v. Starlight Pines Homeowners Ass'n*, 167 P.3d 1277, 1287 (Ariz. Ct. App. 2007) (citing *Wells Fargo Bank*, 38 P.3d at 29–30). "Whether a party has breached the covenant of good faith and fair dealing is a question of fact." *Maleki v.*

---

[5] Plaintiffs produced no evidence or testimony in support of its Count Seven negligent misrepresentation claim that Pandey supplied false information regarding its financial backing and liquidity. The Court enters judgment for Pandey on that claim.

*Desert Palms Prof'l Props., L.L.C.*, 214 P.3d 415, 421 (Ariz. Ct. App. 2009) (citing *Wells Fargo Bank*, 38 P.3d at 31). "The relevant inquiry always will focus on the contract itself, to determine what the parties did agree to." *Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1040 (1985), *superseded in other respects by* A.R.S. § 23–1501. Arizona courts follow the Restatement (Second) of Contracts § 205 (1981), which describes the duty of good faith and fair dealing in contract:

> [B]ad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

*Airfreight Exp. Ltd. v. Evergreen Air Ctr., Inc.*, 158 P.3d 232, 241 (Ariz. Ct. App. 2007).

An agent may be liable for harm to the interests of a principal and may not be entitled to compensation for conduct which breaches the duty of loyalty if that conduct is a willful and deliberate breach of his contract of services. *Johnson v. Pacific Lighting Land Co.* 817 F.2d 601, 607 (9th Cir. 1987) (citations omitted). "If an agent makes a secret and unlawful profit[,] . . . [i]t is clear that he must disgorge the entire secret profit, either under a theory of damages or as a constructive trustee for his principal. *Id.*; *See also Edwards v. Hauff*, 140 Ariz. 373, 682 P.2d 1 (Ariz. Ct. App. 1984). An agent may not even be entitled to compensation for services performed properly for which no compensation is apportioned. *Johnson*, 817 F.2d at 607.

### 2.    Analysis

In Count One, Plaintiffs claim that Pandey agreed to have Plaintiffs act as a mortgage broker and financial consultant to help Pandey find financing for the Holiday Inn, Lafayette property. (Doc. 30 at 7-8). Plaintiffs allege that Pandey agreed to pay it a commission fee of 1% of any loan secured on Pandey's behalf. Plaintiffs further allege it secured a $12 million loan that Pandey accepted, however, Pandey withheld payment of Plaintiffs' 1% commission fee. In Count Four, Plaintiffs claim that Pandey was unjustly

enriched by Plaintiffs' assistance in acquiring the loan. In Count Five, Plaintiffs allege that Pandey, as its principal, owed a duty of good faith to Plaintiffs and by failing to pay its commission, breached that duty. Plaintiff also seeks a declaration of rights between the parties in Count Eight. (Doc. 30).

There is no dispute that the Holiday Inn Agreement was signed by Andrews and delivered to Weintraub on May 28, 2015. (Tr. Exh. 48). The Agreement states "you agree to pay [FCF] a fee of 1.00% of the face or stated amount of any financing placed by, through or with the assistance of FCF. Commission will be earned and payable when a loan is recorded against a property and/or funded." (*Id*.). The agreement letter conveyed a lending offer from So-Gen for $12 million for the Holiday Inn. (*Id*.). Pandey's acceptance of the So-Gen loan triggered Plaintiffs' 1% commission fee of $120,000 which it refused to pay. Pandey does not allege that Plaintiffs did not earn the So-Gen loan commission. Rather, Pandey produced evidence that they believe relieve it from paying the commission as a matter of law.

### 3. Pandey's Affirmative Defense - So-Gen sub-serving fee

Pandey pleaded an affirmative defense that Plaintiffs' breaches of the Agreements relieve it, as a matter of law, from any payment obligation to Plaintiffs. (Doc 84 at 9). Pandey further asserts that it "possesses a right to set-off for commissions collected by FCF which were unearned." (*Id*.). Pandey asserts that Plaintiffs collected $24,500 and additional unearned commissions. (*Id*.). Pandey alleges that Weintraub, while acting as its agent, was acting against its financial interests in arranging the So-Gen loans.

At trial, Andrews acknowledged accepting the $12 million So-Gen loan and withholding Plaintiffs' commission fee in order to first reconcile all of the fees demanded by Weintraub on work performed on the loans. (UT 3/27/19 at 97-99). Andrews testified that he believed Weintraub had taken money not earned and that he instructed the escrow officer to hold back $120,000 from Plaintiffs. (*Id*. at 131-132; Tr. Exh. 10). Pandey's lawyer informed the escrow officer that there was "a dispute as to whether all or part was earned." (*Id*.).

The evidence shows that, on February 18, 2015, Weintraub sent an email to Peter Lewicki, Vice President of So-Gen, instructing him to insert specific language into the loan documents to permit Plaintiffs to receive a sub-servicing fee. (UT 3/27/19 at 29, 38; Tr. Exh. 112). Pandey was not included on the email. Plaintiffs' requested language states:

> "In addition, Borrower acknowledges that Lender may from time to time enter into an agreement under which Lender provides compensation to a broker, mortgage banker, advisor, correspondent or finder (which may be affiliated with Lender) who brought about the issuance of this Application or the consideration of or making of the Proposed Loan[.]".

(Exh. 112). So-Gen inserted the language in its proposed financing terms. (Tr. Exh. 113 at FC002256). As a result, Pandey was bound to pay Plaintiffs a five-basis-point commission as a sub-servicing fee through the lender. Consequently, Plaintiffs received a monthly .05% servicing fee on the $12 million Holiday Inn loan and on the $2.95 million Baymont Inn loan. (*Id*. at 32-35). Pandey unknowingly paid those fees to Plaintiffs.

Weintraub testified that, in securing the So-Gen loan, he was also acting as a sub-servicer on behalf of Wells Fargo (servicer for the trust) or "point of contact with the borrower." (UT 3/27/19 at 35). Weintraub did not disclose to Pandey that Plaintiff was negotiating this additional fee for itself. (*Id*. at 41-43). The evidence thus shows that Weintraub was acting as a dual-agent.

Weintraub was evasive in testifying about whether he disclosed to Pandey that Plaintiffs would receive a sub-servicing fee from the lender to be paid by Pandey. First, Weintraub agreed that the So-Gen application letter did not disclose that FCF would seek a five-basis point commission for sub-servicing. (*Id*. at 42-3). Weintraub also agreed that neither of the Agreement letters disclosed to Pandey that FCF would be receiving a five-basis-point commission from the lender. (*Id*.). Rather, he testified that a sub-servicing fee is an "industry standard" and that receipt of sub-servicing fees are common knowledge and here, "it was common knowledge between myself, him [Andrews] and everybody else in the industry . . . [and] you can't change common knowledge." (*Id*.). Weintraub then

testified that he spoke with Andrews about the sub-servicing fee arrangement, which Andrews unequivocally denied. (*Id.* at 44). Andrews testified that, had he known about Plaintiffs' sub-servicing fee, he would have negotiated with Weintraub for a reduced commission "because he would be making money on the side . . . from our deal." (*Id.* at 70). The Court finds Andrew's testimony credible.

Plaintiffs suggest that, by executing the Summary of Proposed Financing Terms for the Holiday Inn, Pandey waived any claim against FCF for receiving sub-servicing fees. (Doc. 199 at 21). The Court disagrees. Plaintiffs, as Pandey's mortgage broker, owed it a fiduciary duty. Plaintiffs' conduct in negotiating with lenders against their client's financial interest is a breach of that fiduciary duty. *See Rhoads v. Harvey Publications, Inc.*, 145 Ariz. 142, 700 P.2d 840, 847 (Ariz. Ct. App. 1985); *see also Georges v. Accutira Mortage, Inc.*, 2008 WL 2079125 at *4 (E.D. Mo. May 15, 2008) (mortgage broker had a fiduciary relationship with a borrower); *Guth v. Allied Home Mortgage Capital Corp.*, 2008 WL 2635521, at *1 (Ohio. Ct. App. July 7, 2008) ("Mortgage brokers have fiduciary duties to their clients."). Plaintiffs' communication with Pandey's prospective lender was done without Pandey's knowledge. Moreover, Plaintiffs had extensive knowledge about Pandey's financial circumstances. Indeed, Weintraub repeatedly characterized Pandey as not being financially sound or financially sophisticated. Moreover, Weintraub's email to another lender, Thorofare, on May 28 stated "if he [John Serby] asks why the broker point is included tell him that it is company policy that when points are collected that all parties points are collected[.]" (Tr. Exh. 40). This establishes that Plaintiffs were secretly self-dealing in complete disregard of its principal's financial interests.

Plaintiffs' contention that Pandey should have known that a sub-servicing fee would attach to any loan is also irrelevant. Here, Plaintiffs were acting as Pandey's agent and had details about its financial circumstances. Surely, Pandey would not expect its agent would negotiate against its financial interest, especially since Pandey agreed to compensate Plaintiff for his role in finding lenders. What is more, Weintraub went to great lengths to testify that Pandey had insufficient funds, which makes his conduct all the more

concerning.

Therefore, although Pandey benefitted from the So-Gen loans, the Court finds that Plaintiffs' breach of its duty of loyalty and fiduciary duty to Pandey requires that the $120,000 commission be forfeited.[6] *See Johnson*, 817 F.2d at 607 ("If an agent makes a secret and unlawful profit[,] he must disgorge the entire secret profit, either under a theory of damages or as a constructive trustee for his principal."). Pandey also produced evidence of a $24,500 payment to Plaintiff for the So-Gen Baymont Inn loan. (Tr. Exhs. 34 & 138). Therefore, Plaintiffs must disgorge $24,500 to Pandey. *See Hirsch v. Ariz. Corp. Comm'n*, 237 Ariz., 456, 466 (Ariz. Ct. App. 2015) (a court may order disgorgement to prevent a wrong doer from enriching himself by his wrongs). Consequently, Plaintiffs' Counts One, Three, Four and Five fail.

## C.    Pandey's Counterclaim - Breach of Fiduciary Duty (Count One)

The parties' Agreement for the Sheraton Four-Points and Baymont Inn properties conveyed a loan offer from Thorofare of $9 million. (Tr. Exhs. 17 & 22). The loan was to be collateralized by the two properties. (*Id.*). Plaintiffs negotiated that loan with Bill Lanting, a loan originator for Thorofare. Pandey negotiated with Lanting a $1 million advance on the $9 million loan and agreed to pay fees and costs associated therewith. (Exh. 41). Although Pandey negotiated the loan, Plaintiffs received a $10,000 commission on the loan. (UT 3/27/19 at 132).

In its counterclaim, Pandey alleges that, while acting as its agent, Weintraub engaged in written communications with Landing that disclosed its confidential information, disparaged Pandey, and interfered with its attempt to acquire financing from Thorofare. (*Id.* at 12-13). While the $9 million loan offer was pending, Weintraub emailed Lanting on May 28, 2015 the following:

> ***You are going to get a call from John Serby. He is going to be crying about that they are getting a $1,000,000 but can only use $5000,000*** [sic] ***of it*** and that only for a deposit with the seller. I do not know what is going on

---

[6] In so ruling, the Court considers Plaintiffs' conduct with Thorofare and Bill Lanting as discussed below.

- 15 -

there but I suspect that they are talking to another lender for the Radisson but *they do not have any cash for deposits*. *They are short close to $2,000,000 to close the LaFayette purchase so they have to do the Radisson or something else*. *Be firm and do not give them any extra out of the $1,000,000*. *If Serby complains about the cost of paying interest on $5000,000* [sic] *that he cannot use tell him that the cost is only around $3,000 for the four weeks* and that you did not change any points and that is much less than one point. *If he asks why the broker point is included tell him that it is company policy that when points are collected that all parties points are collected*.

*Bill these guys are weird*. *I do not think that Charles Pandey understands how the capital markets work*. . . *With these kinds of properties you are dealing in the real estate equivalent of the junk bond market*[.]

(Tr. Exh. 40) (emphasis added).

Weintraub then forwarded Lanting a May 27, 2015 email from Searby, which included a break-down of how Pandey would allocate its costs and fees on the $1 million loan:

Bill . . . I will NOT agree to a $10,000 broker commission. I still do not have the signed Engagement Letters. *They are trying to stiff me*. *If you are going to pay fees for them you do it directly*, They already paid the fee to So-Gen and to Thorofair. . . *If you give them funds directly they will use the money to line up another lender for the Raddison*. Bill, please call me.

(*Id*.) (emphasis added).

Plaintiffs' communications breached the fiduciary duty it owed to Pandey. *See Haymes v. Rogers*, 70 Ariz. 408, 411 222 P.2d 789, 790 (1950) (citations omitted) ("agent's duty is that "of the most perfect and scrupulous good faith"). Weintraub's statements show a lack of loyalty to Pandey, disclose confidential financial information to its prospective lender, and demean Pandey. Plaintiffs' conduct undermined the purposes of the parties' Agreement. Pandey has met its burden of proof as to Count One of its counterclaims and the Court will enter judgment accordingly.

### D. Pandey's Counterclaim –Defamation (Count Four)

Defendant next alleges that the emails from Weintraub to Thorofare were

- 16 -

defamatory. Under Arizona law, one asserting a claim for defamation must show: (1) the defendant made a false statement; (2) that the statement was published or communicated to someone other than the plaintiff, and (3) the statement tends to harm the plaintiff's reputation. *Godbehere v. Phx. Newspapers, Inc.,* 162 Ariz. 335, 341, 783 P.2d 781, 787 (1989). "To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation." *Id.* Truth is a defense to defamation. *Id.*

The Court finds, beyond the preponderance of evidence, that Weintraub made defamatory statements that ridiculed and impeached Pandey's honesty, integrity and reputation. The Court finds the following statements defamatory:

"[Pandey] does not have any cash for deposits";

"[Pandey is ] short close to $2,000,000 to close the Lafayette purchase";

"If you give [Pandey ] funds directly [Pandey] will use the money to line up another lender";

"Bill these guys are weird";

"I do not think that Charles Pandey understands how the capital markets work";

"[w]ith these kinds of properties you are dealing in the real estate equivalent of the junk bond market";

"[Pandey] is trying to stiff me"; and,

"If you give them funds directly they will use the money to line up another lender for the Raddison."

These statements were published to Lanting while he was arranging Pandey's $9 million loan. The statements were made without Pandey's knowledge. The email communications include statements purported to be fact about Pandey's financial circumstances and alleged Pandey's dishonest business practices. Without question, Plaintiffs' statements ridiculed Pandey and tended to damage Pandey's reputation with Thorofare.

Weintraub did not attempt to defend his statements as fact, and his attempts to

explain them are without merit. Indeed, Weintraub admitted that "these guys are weird" referred to "Pandey as a group." (UT 3/27/19 at 8). He testified that his description of "junk bond market" was a "term of art used in the industry" and he disagreed that it was meant as a pejorative term. (*Id.*). This testimony is undermined by his May 28, 2015 email to Andrews stating "[i]t is like you are dealing in the Junk Bond Market and wanting prime rates." (Tr. Exh. 142). The Court finds Weintraub's conduct self-serving and defamatory. Accordingly, the Court enters judgment for Defendants on their defamation claim.

### E. Pandey's Counterclaim - Tortious Interference (Count Three)

Pandey alleges that the Weintraub communications "negligently, intentionally, and/or recklessly interfered with Pandey's existing and prospective business expectancies," and further that they "have and will interfere with the business expectancies of Pandey and have and will cause losses to Pandey." (Doc. 84 at 15). Plaintiffs argue that Pandey failed to establish a claim for tortious interference with business relations because it did not allege or prove that FCF and Weintraub interfered with an existing contract as required to successfully plead a claim.

### 1. Legal Standards

To assert a claim for tortious interference with business relations, the complaint must allege "the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted." *Miller v. Hehlen*, 209 Ariz. 462, 471 (Ariz. Ct. App. 2005), *quoting Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 427 (Ariz. Ct. App. 1995). "Accordingly, a cause of action for tortious interference accrues when the plaintiff knew or reasonably should have known of the intentional interference with the plaintiff's business expectancy, resulting in its termination; and the plaintiff realized he or she was damaged by that termination." *Dube v. Likins*, 216 Ariz. 406, 411–12 (Ariz. Ct. App. 2007). A tortious interference claim must allege facts showing the expectancy "constitute[d] more than a

mere 'hope.'" *Hamilton v. Yavapai Cnty. Coll. Dist.*, 2018 WL 1784692, at *14 (D. Ariz. Apr. 13, 2018) *citing Marmis v. Solot Co.*, 117 Ariz. 499, 502 (Ariz. Ct. App. 1977). However, "[i]t is not necessary that it be absolutely certain that contracts would have been made were it not for the interference." *See Marmis v. Solot Co*., 117 Ariz. 499, 573 P.2d 899 (Ariz. Ct. App. 1977) (*citing* 45 Am.Jur.2d Interferences § 12).

Furthermore, corporate officers, managers, or directors may be held personally liable for a corporation's torts where they have "participated [in the tort] or have knowledge amounting to acquiescence or be guilty of negligence in the management or supervision of the corporate affairs causing or contributing to the injury." *Marlyn Nutraceuticals, Inc. v. Improvita Health Prod.*, 663 F. Supp. 2d 841, 847 (D. Ariz. 2009), *quoting Bischofshausen*, 145 Ariz. at 210; *see Dawson v. Withycombe*, 216 Ariz. 84, 101 (Ariz. Ct. App. 2007) ("a director cannot be liable without some kind of personal participation in the tort or at least acquiescence by knowledge of the tort combined with a failure to act.").

### 2.    Analysis

Andrews testified that Pandey had a preexisting relationship with Thorofare, having closed a six or seven-million-dollar loan with them for the Quail Hollow resort property. (UT 3/27/19 at 68).  He characterized Pandey's working relationship with Thorofare as good but acknowledged that they could be difficult.  (*Id*.).  Pandey alleges that Weintraub's offending emails resulted in lost business expectations with Thorofare and caused Pandey to incur additional financial damage.  Plaintiffs disagree, asserting that Thorofare reduced the loan after conducting a property appraisal to which it was entitled.  (Tr. Exh. 23). Plaintiffs also argue that Pandey's economic loss is better addressed by Thorofare.  (Doc. 199 at 11).[7]

Plaintiffs arranged the $9 million loan offer from Thorofare to Pandey to be secured by the Baymont and Sheraton properties.  (UT 3/27/19 at 6-7; and Tr. Exhs. 17 and 22). Pandey itself negotiated a $1 million advance against the Baymont Las Vegas to address

---

[7] After learning of Thorofare's reduced loan, Plaintiffs encouraged Pandey to accuse Thorofare of "framing a default" and to "[a]ccuse them of causing you not to be able to close . . .[m]ake Bill Lanting into a con-artist."

the $500,000 required for the Lafayette purchase. (UT 3/27/19 at 159; Tr. Exhs. 39, 41, 42,[8] 44 and 47). The loan advance obligated Pandey to pay 1.85% in origination fees on the $9 million loan. (*Id*. at 159-160). On May 26, 2015, Andrews emailed instructions to Plaintiffs to complete the $1 million loan advance. (Tr. Exh. 40). Pandey's receipt of the $1 million advance triggered a $166,500 closing fee payment to Thorofare. (UT 3/27/19 at 88 and 160; Tr. Exh. 41 and 47). Pandey also paid Plaintiffs a $10,000 broker fee. (*Id*.). Thereafter, Weintraub engaged in the defamatory and offending emails with Lanting and, within several weeks, Thorofare substantially reduced its $9 million loan offer.

Essentially, Pandey argues that, but for Weintraub's offending emails, Thorofare would not have reduced its loan offer. Pandey further alleges that, because Thorofare reduced the loan offer, it had to repay the $1 million advance although it already paid $166,500 in origination fees, $15,000 in yield maintenance, and Plaintiffs' $10,000 broker fee. (UT 3/27/19 at 160). Pandey estimates that it also repaid Thorofare $85,000[9] as a result of the failed $9 million loan transaction. (UT 3/27/19 at 161-162). Pandey argues that it would not have sought the $1 million loan but for Plaintiffs' assurances that Thorofare would loan it $9 million.

Pandey's argument overlooks two critical points. First, Thorofare's loan offer was "subject to, among other things, Thorofare's due diligence and underwriting requirements for financing . . . the Sheraton Four-Points . . and . . the Baymont" properties. (Tr. Exh. 22). Moreover, the loan terms expressly state that the loan amount is the "[l]esser of: (i) $9,000,000[;] (ii) 68% of "as-is" value as underwritten by Lender and as may be supported by an MAI appraisal acceptable to Lender[.]" (*Id*.). In a series of emails from June 26 - 30 2015, Thorofare informed Pandey that the loan offer would be 68% of appraised value

---

[8] Lanting emailed Weintraub that he would seek approval for the $1 million advance, stating, "we would only be doing this as an accommodation to get us to the larger $9 million loan transaction."

[9] Pandey was imprecise in its alleged damages, stating at one point "[s]o I think we were out-of-pocket probably around $65,000, $70,000-ish on those origination fees;" and "I think we were at whether it was 65 or 85, I honestly don't remember the exact number, but we ended up being out significantly, about $85,000 on the origination fees." As will be seen, this lack of specificity of damages does not affect the outcome of Pandey's claim. *See* Fed.R.Civ.P. 26(a)(1)(iii).

because multiple broker opinions did not support a $9 million loan on the properties. (Tr. Exhs. 52 and 53). Andrews acknowledged that "the appraisal for the Baymont came in lower than expected." (UT 3/27/19 at 88). Searby also testified that the $9 million loan did not close because "[t]here were probably a number of reasons, but the indication that we got from Thorofare was that the appraisal value could not sustain the value that they had been lead to believe the Four-Points should be valued at." (UT 3/27/19 at 163).

In addition, Lanting left Thorofare just days after receiving Weintraub's emails. There is no evidence that Lanting shared the emails with others in Thorofare. (*See* Tr. Exh. 52). Moreover, on July 25, Lanting emailed Andrews directly, explained his resignation from Thorofare and offered to find Pandey a lender to "provide the proceeds needed to accomplish the Sheraton Four Points acquisition[.]" (*See* Tr. Exh. 71). This shows that Thorofare's decision to reduce its loan offer was prompted by factors other than Plaintiffs' offending conduct. Rather, Thorofare appraised Pandey's property and, consequently, lowered the loan offer. The terms of Thorofare's loan offer permitted it to do so. Therefore, the Court finds that Pandey did not meet its burden to prove that Plaintiffs interfered with its business expectation with Thorofare.

## III. CONCLUSION

**IT IS HEREBY ORDERED** granting judgment for Defendant and against Plaintiffs on Counts One, Three, Four and Five of Plaintiffs' FAC (Doc. 30); granting judgment for Defendant and against Plaintiffs on Counts One and Four of Defendant's counterclaims (Doc. 84) and granting judgment for Plaintiffs and against Defendants on Count Three of Defendant's counterclaim (Doc. 84).

**IT IS FURTHER ORDERED** that the Clerk of the Court shall remit the $143,000, plus any accrued interest, held in funds by the Court to Pandey.

**IT IS FURTHER ORDERED** that Plaintiffs shall disgorge $24,500 in unearned commission fees to Defendants.

**IT IS FURTHER ORDERED** that Plaintiffs shall pay Defendants $1.00 for Count Four of the FAC.

**IT IS FINALLY ORDERED** that the parties shall pay for their own attorney's costs and fees.

Dated this 3rd day of June, 2019.

Honorable Diane J. Humetewa
United States District Judge